Welcome everyone to the Fourth Circuit today. We have some interesting cases, good lawyers, and we look forward to hearing from you. In this first case, Santos Mejia v. Sessions. Mr. Tingen, good to have you here sir. Thank you your honor. Good morning. Your honor, may it please the court, my name is Jacob Tingen. I am the attorney for Petitioner Maria Santos Mejia and her family of children who have applied for assignment of holding of removal. The primary issues in this case are whether Honduran women evading rape is a particular social group. I think, could you speak into the microphone? Is it not picking me up? Well, you're just speaking sort of softly. Okay, I'll speak up your honor. Thank you. Take your time, go ahead. Whether Honduran women evading rape is a particular social group is one of the first issues. Whether the petitioner pertains to that group is also an issue. And whether her membership in that group is one central reason for her persecution. We have never recognized a group like that. Your honor, I don't believe the Fourth Circuit has, but the BIA has a precedent decision in matter of Kasinga with a group that is very parallel and impossible to distinguish in my view. And it's our opinion that the agency, the Board of Immigration Appeals and Immigration Judge departed from that precedent. And that their attempts to distinguish this case from that case have led to some conclusions that are manifestly contrary to law and abuse. Well, in that case, the government supported the female genital mutilation. Is that the case you're talking about? Yes, your honor. And here the government does not encourage or support rape. So isn't that a key distinction? Yes, your honor, it is a key distinction. I would respond in that the Immigration and Nationality Act provides that asylum seekers can be protected in both scenarios. Because it states that to win asylum they should demonstrate persecution. That the government is either unwilling, so government sanction would fit under that, or unable to prevent. And so in this scenario, the government has proven unable to prevent this societal... Right, and that's another key word, societal. So it's not a particularized group, it's a societal problem in Honduras. It's a general crime. So your social group would include every woman in Honduras. Every woman and girl in Honduras. Your honor, I would respond by saying... Can you answer that yes? No. The answer has to be yes. Your social group would include every woman, every female in Honduras. I don't believe so, your honor. How do you define the social group you're looking to protect here? Well, as we've discussed in the briefs, the social group would not include women who affiliate with gangs, submit to gang and machismo culture. Not what it would not include. I asked how you define the social group you're seeking to protect. Honduran women evading rape, how I would define that social group. I think you just said it, Honduran women evading rape. Yes, that is... Isn't that every woman in Honduras? Well, I would posit that not every woman in Honduras is in this... Want to evade rape? Not that they would not want to evade rape, but that they are in a situation where they would need to. All right. Well, just existing as a woman in Honduras would seem to be a situation in which you would need to evade rape. I mean, I guess the same could be said for the United States. I think every woman in the United States wants to evade rape and needs to evade rape. I would agree with that contention, Your Honor. I don't disagree with that. There's a lot of sense in that. But I would posit that not every woman in Honduras is in a situation where rape is imminent or that they're being targeted for that reason. Okay. For example, we noted in the brief and also the government commented that, for example, on page 65 of the administrative record, during a conversation with the judge, this topic came up earlier. And so the government said, in general, this would amount to Honduran women evading crime, and I don't think there's anyone that actually supports or goes towards crime necessarily unless you're part of the gang, I suppose. And so gang affiliation or women in positions of power might not fit into this group, and so it delineates it some. Now, I would also say that there are other existing board precedents. There's a matter of ARCG, for example, where Guatemalan women in domestic relationships would receive asylum protections if those relationships are abusive. Well, virtually every Guatemalan woman is in a domestic relationship, is part of a family group, and so that would be virtually every woman in Guatemala and potentially bigger than this group because not all women are subject to threats of rape. Okay. Furthermore, I think I'd like to spend some time on the matter of Kasinga just to demonstrate it's almost impossible. That's your best case as far as you're concerned? Yes, Your Honor, that is my best case as far as I'm concerned. I believe the matter of Kasinga, distinguishing between matter of Kasinga and this case is very difficult to do, and as the courts below have attempted to do so, they've come to conclusions such that the immigration judge, for example, stated that Honduras recognizes rape victims as a social group but not attempted rape victims as a social group, and so that would lead to the conclusion that had the petitioners in this case been raped, then they would qualify for asylum, and I don't believe that that should be the law. That appears as an abusive discretion of manifesto contract law to me. Additionally, when the BIA stated that crimes such as rape are not integral to the individual identity of a young woman, that seems to me a little beyond the pale, to be honest, Your Honor. Rape, of course, would be integral to the individual identity of a young woman, so as they've tried to distinguish this case from Kasinga, those are the conclusions that they've arrived at, and matter of Kasinga makes it quite clear that, I mean, the social group there is women opposed to female genital mutilation. That would be virtually every woman, and yet it was approved as a social group. Now, the argument about that case being out is presented both to the immigration judge and the board, correct? Yes, Your Honor. And they both rejected it. They both rejected it. And the government says in their briefs here that it's distinguishable. That's not the problem. The government's consistent on this position. The government has been consistent on that position. And they rejected it. And rejected it. Our position is that that's really the case, the whole case here is whether that case was applied appropriately. Applies here. Okay. Yeah, and our position, again, is that as they've tried to do that, they've arrived at conclusions that are not above reproach. Your position is that the IJ got it wrong, the board got it wrong, and the Attorney General has it wrong. Is that it? Yes, Your Honor. Yes, Your Honor. I point to my reply brief where I included a chart that I had submitted to the BIA. This is on page 9 of my reply brief. And the immigration judge provided a summary of Kasinga and his opinion, and I've reproduced that here, and provided a parallel of the petitioner's case. So, basically, the only difference in this case is that female genital mutilation was sanctioned by the government, whereas rape is, in theory, punished in Honduras, though as a practical matter, the record supports that it is not. And so then it comes down to an issue of, under the INA, is the government unable or unwilling to provide assistance and protection against this form of persecution? And where is that evidence that the government accepts and approves of rape, like in the Togolese case? There is no evidence that the government approves of rape, but an asylum applicant only needs to prove that the government is either unwilling or unable to prevent the persecution. And in this scenario, the government has proved unable to prevent this persecution. That is the definition of an asylee, someone who has been persecuted, whose government is unwilling or unable to prevent their persecution. Wasn't the family originally targeted because of the gang membership? They didn't, the extortion threat, the money that the gang wanted. So, I'd like to respond to that. Yes, it does appear that money played a part. However, when it comes to Nexus, we only need to prove that the social group is one central reason for the persecution suffered. Now, when they arrived, I believe it was in April of 2014, pounded on the door, 1 a.m., demanded that she send her daughters out to play. They wanted money first, right? Money came up that night, yes, Your Honor. Okay. But when they demanded that she send her daughters out to play, that to me, one, would not have happened. That language would not have been used had it been a house full of boys. So, they would not have said, send your sons out to play. So, there's virtually no other meaning that it can have. And then secondly, after they took steps to prevent playing, in quotations, that is when shots were fired at the home, which has to be past persecution because in this court, threat of death is persecution. I mean, shots fired at a home must also count and qualify. We've maintained that persecution has been suffered as a result of their opposition to this kind of sexual threat. Okay. Thank you, sir. I have three more minutes. I don't know if you need to respond to anything else. Okay, go ahead. I thought you were ready to sit down there. Yeah, thank you, Your Honor. I would also like to respond to one issue that I believe is an issue and that the court does need to decide upon. In fact, the court must decide that come out to play had a sexual intent. The immigration judge said that it's not clear without a further indication. And the BIA agreed that a further indication was necessary. Yes. However, in my view, the judge, the immigration judge, was clearly erroneous. And so, yeah, I mean, what other meaning can it possibly have than the meaning that we put forth? But even if we agree with you that it did mean that they were intent on raping the daughters, you would still have to get over the hurdle of we'd need to find that as a particular rise. A social group, correct? Yes, Your Honor. And let me address that briefly. So first of all, to be a particular social group, it has to be immutable, particular, distinct. So nobody disputes that this group is immutable, either due to gender or past shared circumstance. Nobody disputes that it's immutable. When it comes to particularity, the judge waffled on how he defines that. So first he said that opposition and evasion can't be part of a social group. However, it clearly is. I mean, in the matter of Kazinga, opposition is part of that social group, opposition to the practice of female genital mutilation. But additionally, and I think this is an important distinction to make as well, the judge stated he used as examples that opposition and avoidance, refusal to join gangs, has not amounted to a social group. And I think there's an important distinction here. So the matter of Kazinga is opposition to persecution. These other cases that the judge used to argue against this are not opposition to persecution. Opposition to joining a gang, joining a gang isn't per se persecution. But opposition to being raped, that's opposition to persecution. Opposition to female genital mutilation, that's persecution. So that's a distinction between the cases the judge used to rebut our contention that the group is particular. And so additionally, I would return to the fact that not necessarily every woman would fall in this group because not every woman in Honduras is in a position where they would be a victim of rape. Those who are in a position where they would be a victim of rape, I would agree. Most, virtually every woman would want to avoid nonconsensual sexual contact. I don't dispute that. However, given the board's other precedents, matter of Kazinga, ARCG, there are groups that would include virtually every woman in those countries and relevant societies. And yet, why would we protect gender-based violence there but not here? I don't see a meaningful distinction, and the lower courts did not make one either. And I believe that's my time. Very good. Thank you, sir. Thank you. Commissioner Pennington. Thank you, Judge King. Good morning. Greg Pennington on behalf of the Attorney General. I'll start with matter of Kazinga because that seems to be where she's hanging her hat on this case. In addition to the government in Togo kind of accepting the practice of FGM and encouraging it almost, as Judge Thacker noted here, there's no evidence to show that rape is actually sponsored by the Honduran government and it's punished pretty harshly, at least according to the State Department reports. But something that was also left out is particularity. In the Togo case, it was one tribe in Togo. Here, as Judge Thacker noted, it swallows all the women in Honduras. And the way Ms. Santos tries to distinguish that is she says that, well, not every woman is in the position to be raped. Well, that wasn't her particular social group at the agency. And in the same way as in her opening brief, she says, well, her particular social group also includes religious women who oppose machismo culture. That also wasn't the particular social group she proposed to the agency. So she's, in essence, kind of demonstrating that her particular social group lacks particularity because she's starting to narrow it here in this court. And that's just not something that she can do. Everything she has to present to the agency first in order to get it properly before this court. So matter of Kazinga is distinguishable as the agency held. I raised that case all the way through. I said, that's our case. They're relying on the same authority here like they rely on the IJA and the board. Right. They're relying on the same authority. Right. They're just saying that their particular social group of Honduran women evading rape includes religious women who oppose machismo culture. It includes women who are in a position to be raped, as she was in the house that night. So she's narrowing it. And for a particular social group to meet the particularity requirement, it has to have narrow and definable boundaries. And she is further narrowing it here in this court. And I think that demonstrates that her group was overbroad before the agency. And as the immigration judge held, what does evading rape mean? Does it mean women who are in a position to be raped to actually say no and run away? Is it women who avoid going out altogether? Is it women who testify in support of their abusers? There's too much there, and it's just contrary to what the board in this court has required with regards to particularity. And I think this case here likens mostly to the gang cases that we've had over the past decade that the board has had and this court has had in Zelaya and Lizama, where you have young men coming from one of these Central American countries that are victims of crime. They're victims of gang recruitment. And when they don't submit to those gang recruitment requests, they're extorted or harmed. And consistently, the agency and this court have held that that's not a basis for asylum. And in order to have the agency's decision here overturned with regard to a particular social group, she needs to show that the agency's decision was manifestly contrary to law. And how can that be the case when it's completely consistent with the board's past precedents and this court's? And moving on from particularity, there's also the issue of social distinction. And for that, the board looks to evidence of historical animosities towards certain groups discrimination, laws, and there's nothing in the evidence to show that women evading rape have been particularized in any particular way in the society. There's no evidence to show that society recognized them as a distinct group. So without meeting the particularity and the social distinction requirements, her particular social group has to fail. And if it fails, there's no further inquiry needed. But if the court were to go on from there, the other issue is nexus. And here we have one note left at her doorstep that says that she was elected and signed by the MS. There was no indication of what she was elected for, but she surmised that it was to pay rent, to pay some kind of extortion. And one month after that note was left, these men showed up at her door, I guess, to collect on that demand. And when she said no, that's when they started to further threaten her, and they fired shots off as they were running away. Now, the immigration judge held that there was no evidence to show that that was intent to harm her as a woman evading rape in Honduras. And I think that's where the petitioner gets a little confused here in saying that, well, maybe that immigration judge aired saying that that saying we want to play with your daughters did not mean intent to rape. That's not what the immigration judge or the board said. They said that that was not enough evidence to show that that was intent to harm on account of a woman evading rape. So there wasn't that causal nexus between the harm that was going on that night and her proposed particular social group. In fact, she didn't become a Honduran woman evading rape until after that incident happened. She didn't actually evade rape until they hunkered down in the bathroom and started screaming and these men left. So she would have to show that, again, the record would compel, no reasonable fact finder could find that there was no nexus here. And she simply just hasn't done that. And that was the past persecution issue. If we move on to a well-founded fear, again, she would have to show a reasonable possibility that these men or somebody else would target her as a woman evading rape, again, And the immigration judge said that she hadn't met that burden, and she hasn't pointed to anything in the record to show that that would compel a reasonable fact finder to an opposite conclusion. The police said that they would protect her. They would up patrols. She lived at an in-law's house for a week with no harm. She hasn't shown any reasonable possibility that she would be harmed on account of being a woman who evaded rape. The only evidence shows that these men wanted money from her, and that's the only nexus that is shown by the record. And that's pretty much the government's case in here. We don't believe any reasonable fact finder would be compelled to find that this is a particular social group, and on top of that, that the government or the agency didn't reach that, but that there would be a nexus to her particular social group and any future harm. So unless the court has any questions, I'll submit. Thank you, Mr. Panikin. Mr. Tengen? Yes, Your Honor. You're reserved a little bit, Tom. Thank you. So let me just begin with the idea that the judge said that they were not afraid. The government just made that contention, but I'll read from the record. Given the country conditions evidence regarding violence and sexual crimes against women, this is from the immigration judge's opinion on 323, and the respondent's experiences with unknown men banging on their door asking for a female to come out and play, the court finds the respondent's fear of persecution as objectively reasonable. So the judge established that there was fear of prior and future persecution. So I just want to throw that out there. The idea that rape is punished severely in Honduras is laughable. That's supported by record evidence. The country conditions summary that the Department of Justice itself compiles and is regularly submitted in immigration court, the judge referenced it in his opinion and stated that a lot of these crimes occur with impunity. With regards to particularity and distinction in terms of the issue of the social group, well, he's saying, the government is saying that we're changing our social group, and that is not the case. As the court noted, our argument has been the same from the beginning. So, and furthermore, even if we did change our argument, legal issues are reviewed de novo. So the matter of whether or not there's a social group. Yes, Your Honor, and that's what we get to is that the judge said, you can't define this by actions, and we said, well, Your Honor, I mean, the immigration judge said you can't define a social group by actions, and while we don't concede that's true because the matter of Kazinga clearly defines a social group by opposition and evasion of female genital mutilation. So that's permissible. But even so, we point out that record evidence supports delineating the boundaries of the position of social group as Honduran women with a religious inclination. They take pains to avoid machismo and gang culture. The family attended church together, and when they confronted threats, they prayed. So these are people with a strong moral compass who would take efforts and pains to avoid this particular form of persecution. And then with regards to distinction, again, this is where the judge said that Honduran society, in his analysis with regards to distinction, that Honduran society recognizes victims of rape as a distinct group, and yet victims of attempted rape are not. That, again, would lead to the conclusion that they must be raped first prior to asylum being granted, where that cannot be the law. I mean, the threat of persecution should be sufficient, and these women fit into that group. And then as far as nexus, you know, this court has recently, the government mentioned how the immigration judge had stated that without more, come out to play is insufficient. This court recently decided in Savaleta that it's unreasonable to expect a gang would articulate in a note all of the legally significant reasons that they would persecute someone. I would posit that that applies here. It's unreasonable to expect that a persecutor would stand in front of the door and say, send your daughters out to play, and by that I mean let me rape them for the following reasons. And then before they fire their guns at the house, before they run away, we are doing this because you said no. That's absurd. And so, you know, that's, in terms of nexus, clearly they were persecuted because of their opposition and evasion of the persecutor's tactics. So I don't believe that that stands up in the argument here, and I have a minute, so I can take questions if there are any, but if not, I'll be done. Thank you, Mr. Tengen. We appreciate it. Thank you. We'll come down to Greek Council and then go to the next case.
judges: Robert B. King, Henry F. Floyd, Stephanie D. Thacker